## COPPERSTEIN SUPPER CLUB, INC. v. PUBLIC MEAT COMPANY AND ANOTHER.

146 N. W. (2d) 595.

November 10, 1966—No. 39,850.

*Kelly, Lee & Odell,* for appellants.

*Cragg & Barnett* and *David A. Bailly,* for respondent.

FRANK T. GALLAGHER, C.

Appeal from an order of the district court denying defendants' motion for judgment notwithstanding the verdict or a new trial on all issues.

The action was brought by Copperstein Supper Club, Inc., which operated a restaurant in the shopping center of Tonka Terrace in the village of Tonka Bay, against Public Meat Company and Edward Stanke to recover damages and punitive damages for claimed fraud in sales of meat products to plaintiff.

According to the record Copperstein served primarily steaks, chops, and sea food. It was in operation from 1957 up to the time of trial in 1964. Public Meat is a corporation owned by defendant Stanke and his wife. It is engaged in the business of selling meats to restaurants, schools, and retail markets. Stanke had been an employee of Dodds Meat Company before he started Public Meat in October 1959. When he was an employee of Dodds, the supper club ordered meat from that firm, but after he left to start Public Meat in October 1959, Copperstein started buying meats from Public Meat and did so until October 3, 1962.

There is testimony in the record that Copperstein had no scales with which to weigh meat and that in 1959 defendant Stanke gave it a 2-pound or "portion" scale. From October 1959 until October 3, 1962, the procedure followed by the meat company and Stanke with respect to the Copperstein sales remained the same. This procedure was substantially as follows: Stanke would take the orders from Copperstein by telephone. The order would list the quantity wanted of different items such as tenderloins, prime ribs, etc. Stanke would record the order on a worksheet, the contents of which would be transcribed to order forms, of which the customer would receive copies. The worksheet would then be filled out either by Stanke or Clark L. Heimark, a truckdriver and meat cutter employed by Public Meat. The worksheets were kept a few weeks and then discarded, so none was offered in evidence by defendants.

During the time involved herein, the owners of Copperstein did not actively engage in the operation of the restaurant but had different managers doing so from time to time, although Keith Whitney, one of the owners, sometimes assisted the manager. All meat buying and procedures to be followed with meat were left to the chef. Up until September 12, 1962, Copperstein had no scales large enough to weigh the various deliveries received from Public Meat. Whitney and several of Copperstein's

employees testified that they relied upon the customer's copies of the orders as correctly stating the weights of the deliveries.

Whitney testified that between October 1959 and October 1962 he occasionally saw the packages of meats delivered and that he suspected the weights were short at various times during that period. In any event, Copperstein purchased a scale large enough to weigh the deliveries and did so from September 12 to October 3, 1962. There is evidence that this weighing took place out of the presence of any of the employees of defendants; that at least two and sometimes more employees of plaintiff were present at these weighings; and that on September 21, 1962, and October 3, 1962, an employee of the Twin City Testing Laboratory was present and verified the accuracy of the scale and the weight of the meat as delivered.

Between September 12 and October 3, 1962, 14 deliveries were made consisting of 74 items. Forty-five of the items were either properly weighed by the meat company or were less than 1½ pounds off. Twelve items consisted of prime ribs or leg of veal from which bones had been removed. In 29 items there was a difference between the weight of the delivery and the purported weight on the invoice. In view of our decision that a new trial was properly granted on the issue of damages only, we deem it unnecessary to itemize the various items in which weight shortages were claimed.

The jury in its verdict for plaintiff awarded compensatory damages of $2,500 and punitive damages of $1,382.27. Thereafter, defendants moved for judgment notwithstanding the verdict or for a new trial on the grounds that the verdict was not justified by the evidence; that it was contrary to law; and that the court's charge to the jury as to elements of fraud to be proved by plaintiff and as to the extent, nature, and type of damages allowable was in error and prejudicial to defendants. The trial court issued an order (1) denying defendants' motion for judgment notwithstanding the verdict and (2) granting a new trial on the issue of damages alone unless plaintiff filed a consent that the award of compensatory damages be reduced to $1,117.73. Plaintiff did not file such consent, and defendants appealed from the order.

With respect to the grounds urged by defendants for a new trial, the

court stated in a memorandum accompanying its order that (a) defendants' contentions that the evidence was insufficient to sustain a finding of fraud and that an account stated was proved were entirely without merit; (b) it having been established to the satisfaction of the jury that there were in fact fraudulent misrepresentations, there was no question that plaintiff relied upon them in making payments for the excess weights; (c) the finding by the jury that there was no waiver by plaintiff was amply sustained by the evidence; and (d) the basis for an award of damages for the period prior to testing by plaintiff was not wholly conjectural.

In concluding the trial court stated:

"* * * [T]here is one matter for which this Court thinks there should be a reduction in the amount of the verdict. The portion of the Court's charge dealing with the determination of the amount of damages if the jury should decide that plaintiff was entitled to recover was very inept and likely to be misunderstood. After explaining to the jury that there was an unpaid balance on plaintiff's account with defendant company, the amount of which was not in dispute, it was stated that if the jury should award damages only for the period from September to October, 1962, and that amount was less than the amount due on the account, it should be deducted from the amount of the account and a verdict should award the balance. It did not make clear that if damages were to be awarded for the prior period and the total amount exceeded the amount of the account, then the amount of the account should be deducted from the larger amount and a verdict rendered for the difference. It is impossible to tell from the verdict whether that was done. It seems possible that the jury did give defendant company credit for the account and sought to deprive it of the benefit of such credit by awarding punitive damages in exactly the amount of the book account. But there is no way of telling whether this was the thought that actuated the jury. The Court has therefore decided that there should be a new trial on the question of damages, unless plaintiff consents to a reduction of the verdict accordingly."

We agree with the trial court that there might well have been confusion

on the part of the jury with respect to the amount of damages and that a new trial should be had on that issue since plaintiff did not consent to a reduction of the verdict.

We are satisfied that the record contains sufficient evidence to justify the jury's findings with respect to fraud, reliance, and absence of waiver. The order granting a new trial on the issue of damages only must therefore be affirmed. Because of our decision, we deem it unnecessary to pass on questions involving admissibility of evidence, instructions, and questions of law with respect to that issue inasmuch as those questions will have to be determined as they come up at the new trial.

Affirmed.